Filed 2/26/16  Weidner v. Eads CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| CHRISTINE CAIN WEIDNER, | H040950 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. 1-13-PR-172302) |
| v. | |
| BARBARA EADS, | |
| Defendant and Appellant. | |

Edward M. Cain (Cain) executed a trust instrument creating the "Cain Family Trust" (Trust) on September 6, 2000.  The instrument identified "Christine M. Cain"[1] as his child.  Cain was both the settlor, sometimes referred to as the trustor (Rest.3d Trusts, § 3, & com. a, p. 36), and the original trustee of the Trust.  Cain died on January 8, 2013.

After Cain's death, his daughter Christine Cain Weidner (petitioner), a named successor trustee and beneficiary of the Trust, filed a petition pursuant to Probate Code section 17200[2] that sought judicial interpretation of the terms of the trust instrument and instructions.  Handwritten, penciled-in notations had been added to the original trust

---

[1] A handwritten "/Weidner" was inserted immediately after "Christine M. Cain" on the original trust instrument.

[2] All further statutory references are to the Probate Code unless otherwise specified.  Section 17200 provides in part:  "(b) Proceedings concerning the internal affairs of a trust include, but are not limited to, proceedings for any of the following purposes:  [¶]  (1) Determining questions of construction of a trust instrument. . . . [¶]  (3) Determining the validity of a trust provision. . . . [¶]  (6) Instructing the trustee."

instrument but none were dated, initialed, signed, or notarized. Barbara Eads filed an objection and opposition to the petition.

Subsequent to a multi-day hearing, the probate court determined, among other things, that Cain's intention to revoke the paragraphs providing for distributions to Larry Smith[3] and Eads was clear and that Eads should not serve as a co-trustee.

On February 7, 2014, the probate court issued its formal order specifying in part that petitioner was the sole successor trustee of the Trust[4] and Cain had "revoked" the distributions to Eads and Larry. The order confirmed that certain assets were assets of the Trust.

On appeal, Eads asks this court to reverse and remand the case with instructions to give legal effect to the trust instrument as originally written. She asserts that the probate court erred by (1) disregarding the absence of any extrinsic evidence of the circumstances surrounding the handwritten notations and interlineations on the original trust instrument, (2) concluding that the word "eliminate" handwritten in the margin of the trust instrument, next to the paragraphs providing for distributions to Larry and to her, constituted effective partial revocations of the Trust rather than failed attempts to amend the Trust, and (3) not reading the handwritten notations as a whole.

We find the claims of error to be without merit and affirm.

I

*Evidence*

Petitioner, Cain's only child, had a close but volatile relationship with him.

---

[3] Larry was Cain's younger half-brother and one of three half-siblings. We refer to him by his first name because the surname of another half-sibling mentioned in this opinion is also Smith.

[4] On appeal, Eads does not challenge the lower court's implied determination that she was not a successor joint trustee with petitioner.

Petitioner's mother was Cain's second wife, and they were married for "20-some years." After their marriage ended, Cain never remarried.

Petitioner married David Weidner (Weidner) in 1997 or 1998. Before moving to California in 2012, petitioner and her husband lived in New Jersey and then New York. They had three daughters, who, at the time of the hearing on the petition in 2013, ranged in age from five years old to 10 years old.

Although Cain lived in Los Gatos, California, Weidner and Cain were fairly close from the beginning. They spoke at least monthly. They had common interests in financial matters and baseball. Cain talked with him about broad investment strategies and Cain's specific investments. Subsequently, in 2009, Weidner became a financial columnist for the Wall Street Journal.

During the 15 years prior to his death, Cain regularly spoke with petitioner about his assets and holdings. While petitioner was still living in New York, he sent documents for her to sign and return so that she could be a signatory on his Fidelity accounts.

Over the years, Cain had mentioned a number of his female companions to petitioner. Those included Eads, Pamela Davoren, Linda Ketenjian, and Carol Anderson.

Eads indicated that she had a 25-year relationship with Cain. In 1995, Cain purchased two cemetery plots in the Pacific Grove cemetery and, according to Eads, one of those plots was intended for her. Eads stated that Cain and she spent most weekends together, mostly at her house in Pacific Grove. At times, they spent several days together visiting the home of her sister, son, or daughter.

Davoren indicated that she met Cain when she was working as a contractor at NASA's Ames Research Center; they began dating in 1993. Cain worked for NASA as an engineer at Ames Research Center. They had a very close and intimate relationship from 1995 to 2000. Davoren lived with her twin sister, Trisha, in Los Gatos. According to Davoren, from 2000 to 2005, Cain and she were still close and they were intimate at times; they saw each other at least three times a week. Between 2005, the year when

3

Cain retired, and 2009, Cain and Davoren continued to see each other about three times a week.  Cain frequently spent weekends away in Monterey.

Cain executed his Trust and his "Last Will and Testament" (Will) on September 6, 2000.  On the same date, Cain also executed a document transferring certain assets to the Trust.  Petitioner became aware of the Trust in 2000.

The trust instrument executed by Cain established an education fund for his grandchildren, great-grandchildren, and "successor great grandchildren."  It provided in pertinent part:  "All Estate Trust funds shall be held in trust for an annual calculation on December 31st to determine the calculated value of the Trust Estate and related distributions to beneficiaries as follows:

"One percent (1%) of the calculated value of the Trust Estate shall be distributed in one payment to the Education Fund as described above.

"The following distributions shall be made to the named beneficiaries, or as applicable to said beneficiary's issue, when said beneficiary reaches age fifty (50) years or is certified by two (2) physicians as being incapacitated, either mentally or physically, which would restrict said beneficiary's earning potential:

"Five percent (5%) of the calculated value of the Trust Estate shall be divided by Twelve (12) to determine the amount of the 12 equal monthly distributions to CHRISTINE M. CAIN, free of trust.

"Two and one-half percent (2.5%) of the calculated value of the Trust Estate shall be divided by Twelve (12) to determine the amount of the 12 equal monthly distributions to BARBARA EADS, free of trust.

"One and one quarter percent (1.25 %) of the calculated value of the Trust Estate shall be divided by Twelve (12) to determine the amount of the 12 equal monthly distributions to LARRY SMITH, free of trust."

The trust instrument reserved to the settlor the powers of revocation and amendment of the Trust.  It stated as to amendment:  "The TRUSTOR, EDWARD

4

M. CAIN, while living and competent, shall have the absolute power to alter or amend this trust in whole or in part at any time by written instrument signed and delivered to the trustee." It provided as to revocation: "The TRUSTOR, while living and competent, shall have the absolute power to revoke this trust in whole or in part and restore to the TRUSTOR the respective rights of testamentary disposition by written instrument filed with the trustee. The TRUSTOR shall have the right to add property to the trust at any time and may at any time withdraw or remove property from the trust." The trust instrument specified in pertinent part that, "[a]fter the death of TRUSTOR, the trust established by this declaration may not be revoked or amended . . . ."

In approximately 2003 or 2004, Cain was diagnosed with congestive heart failure. In 2005, Cain retired from NASA.

On April 15, 2009, Cain underwent surgery for his heart condition. At that time, petitioner was concerned about her third child, who was just under a year old, who had been in the newborn intensive care unit (NCIU) for three weeks, and for whom flying was not recommended by her doctor. Petitioner did not go to California for the surgery but she spoke with Cain's doctors and nurses.

Prior to his surgery in April 2009, Davoren attended many medical appointments with Cain. Cain asked Davoren to help him after the surgery.

After the surgery, Davoren lived "24/7" with Cain at his home for nine months. Davoren cared for him, cooked, cleaned, ran errands, and attended medical appointments with Cain. Davoren indicated that she slept in Cain's bed; Cain was having difficulty breathing at night. Cain paid her $2,250 a month.

Cain never gave Davoren control of any of his accounts. She did not help him pay his bills while he was ill.

In July 2009, petitioner and her family came to California to visit Cain and stayed in Seascape for 10 days. Cain and Davoren visited them in Seascape.

5

During that extended visit, Cain told petitioner that he had only three months to live. Cain and petitioner talked about how much they loved each other, what Cain wanted for his grandchildren, and the Trust. He told her that his grandchildren and she were the beneficiaries. Cain told petitioner that he wanted his grandchildren to go to good private schools. Cain said that he loved his grandchildren and loved her, and he wanted them "to have everything." Cain and petitioner discussed her future role as a trustee of the trust. He explained his approach to investment and property management to her. Cain compiled some information concerning his funeral and burial wishes for her.

Petitioner went with Cain to see his physician, Dr. Sharpe. The doctor confirmed that Cain had three months to live.

Also during that visit, Cain took petitioner to see his Quail Court property at Carmel Valley Ranch. Eads, who was a licensed real estate agent and who had represented Cain in four real estate transactions for which she had been fully compensated, accompanied them.

Weidner recalled that at some point during that 2009 visit, petitioner, Weidner, and Eads had a conversation about Davoren. Weidner did not trust Davoren and he was very concerned that she had access to Cain's financial records and credit cards.

On August 8, 2009, before petitioner and her family left the west coast, petitioner and Cain exchanged e-mails. In petitioner's e-mail, she stated in part: "You have been very careful with your money over the years, generous with others but never lavish with yourself. Now you have left it to me—a lot of money as executor of your trust. I will follow in your steps. I hope I will make you proud." Petitioner thanked him profusely and described her life goals and her educational and enrichment goals for her children and she expressed her deep appreciation and love for him. In his reply e-mail, Cain thanked petitioner for the "wonderful message," which was "better than any medicine," and told her that he loved her very much. Petitioner and her family returned to New York on approximately August 8 or 9, 2009.

6

On August 10, Cain forwarded petitioner's e-mail message to Eads.

On August 29, 2009, petitioner returned to visit her father, and she stayed with him for three or four days. During this second visit, Davoren temporarily returned to her own home but she still went over there "quite often."

During petitioner's second visit, Cain "spent hours and hours" providing information that he thought petitioner would need "to take over his world." Petitioner wrote it down in a memoranda book provided by Cain. The purpose was to make sure that petitioner would know exactly what do to when he died. He gave petitioner information regarding his various accounts and the associated user names and passwords, his monthly expenses and the accounts from which payments were made, his stock, his credit cards, his pin number for his cash card, and important contact numbers. Eads acknowledged that she was not privy to any conversation between Cain and petitioner about his finances during that time. Cain and petitioner hid the book in a box in his closet, and after Cain died, petitioner retrieved it.

Some time before his death, Cain added handwritten notations to the trust instrument. Two paragraphs providing for distributions, one to Eads and the other to Larry, were lined out by hand. Adjacent to each of those two paragraphs was the handwritten word "eliminate" and a hand-drawn arrow that pointed to the paragraph. In the margin next to the paragraph providing for a distribution to petitioner, there were arrows pointing to the paragraph and a notation "change to 4%." On page 5 of the trust instrument, in the margin next to the paragraph regarding the distribution of the remainder of the trust estate, a handwritten notation states: "specific distribution as noted—"

At some point, Cain had indicated to petitioner that Larry had drug and alcohol problems and "additional income would be detrimental to his survival." Cain had mentioned to petitioner that he was not going to leave anything to Larry. At the time of the hearing, petitioner did not know where Larry lived.

7

After petitioner's second visit in 2009, Cain and she communicated through telephone calls and e-mail messages. He involved her in business and medical matters. Cain loved his grandchildren, and, while they lived on the east coast, he talked with them over the computer a couple of times a week.

According to Davoren, during the nine-month period she cared for Cain in his home in 2009, Eads visited Cain two or three times. Davoren knew that Eads had a prior relationship with Cain; Eads was very controlling and possessive when she was around Cain.

In about January 2010, Davoren reduced her caretaking schedule to about three times a week (Monday, Wednesday, and Friday). She would help with the chores, and she was a companion. Cain paid her $1125 a month.

Petitioner's family visited Cain several times between 2010 and 2012. During a February 2011 visit to California, petitioner and her husband understood that Cain needed them to be there for him, and they began contemplating a move to California.

Cain moved his residence about a year and a half before he died; Davoren helped him pack, wash, and organize for the move. Eads was not involved in preparing for the move.

In November 2011, after petitioner and Weidner had decided to move their family to the west coast, Weidner traveled to San Francisco for job reasons and visited Cain. They had a very detailed conversation about the Trust, and Cain showed Weidner a binder. He indicated that the Trust was for petitioner and his grandchildren and that petitioner would "serve as the steward."

On May 3, 2012, Cain executed a new "Designation of Beneficiary" form regarding his thrift savings plan account, naming Eads and Davoren as the beneficiaries. Under the new designation, Eads and Davoren were each entitled to 50 percent of Cain's account. In a conversation with Cain at some point, Weidner learned that "fairly significant sums of money" in an account would go to Eads and Davoren.

8

When petitioner and Weidner bought property in Marin County in 2012, they used a real estate broker with whom Eads had connected them. Petitioner's family moved to California in July 2012.

After petitioner's family had moved out to California, Davoren traveled to petitioner's home about five times. Aside from the one time she visited with her sister, Davoren visited with Cain. Once she went to a birthday luncheon event with Cain in Fairfax and then to a birthday dinner celebration for his middle granddaughter in Mill Valley. Eads was not at the dinner.

Cain expressed concern to Davoren about the future of his daughter and his grandchildren. Any time he mentioned his estate or assets, he indicated they were meant for his family. Cain expressed his hope that Eads's family would assume responsibility for Eads.

During the last few months of Cain's life, petitioner was very active in his medical care.

The December before Cain died and before his final hospitalization, Cain showed Davoren the paperwork designating her as a 50 percent beneficiary of his thrift savings plan account.

After attending a 2012 Christmas party with Eads and her family, Cain's medical condition worsened. Eads brought Cain home. Davoren and Trisha stayed with him for two or three days and then called petitioner, who came. Petitioner and Eads, who returned, stayed with him overnight and then took Cain to see Dr. Sharpe; Cain was admitted to the hospital. Petitioner was with her father in the hospital.

At that point, petitioner believed that Eads and she were friends. Cain insisted on leaving the hospital and going home; he wanted to do his taxes with petitioner so she would understand them and to tell her "how to run the estate." Petitioner briefly returned home while Davoren and Trisha took care of Cain and then returned to her father's home. Cain had petitioner pull out all the paperwork and records, and they went over them

9

together. They were sitting on the couch with papers spread out all over the place. Eads was not involved; Cain never sat down with petitioner and Eads to go over financial matters.

In the process of working on Cain's taxes and going through his check registers, petitioner learned that checks had been written to Eads. Cain told petitioner that he had loaned Eads money over the years and that he had given her gifts. Although Eads was present in Cain's home at least part of the time during that period, Cain did not indicate to her that she would be involved in the administration of his assets.

Petitioner made arrangements for hospice for her father. Eads, Davoren, Trisha, and Lee Judson Pulver (Cain's neighbor and closest friend) were also present in Cain's home while he was in hospice. Petitioner's daughters and husband came to visit but they were not present the entire time. During this time period, Eads told petitioner that Davoren was "a gold digger" and manipulated her father.

Cain died on January 8, 2013 while petitioner was present. After Cain's death, petitioner, as instructed by him, retrieved the binder containing the trust documents from under his desk. Eads was present by the desk when petitioner opened the binder. Petitioner had never before looked at the original trust document or a copy. After Cain's death, petitioner found copies of her August 8, 2009 e-mail to him in his trust binder.

According to petitioner, petitioner also opened the desk drawer and found a large stack of uncashed checks payable to Cain from Eads. Attached by paper clip to each uncashed check was a sticky note. Each sticky note was labeled "I.O.U." and stated the amount of the corresponding check; the sticky notes were signed by Eads. Petitioner remarked to Eads, who was sitting next to her, that it was a lot of money, and Eads began to cry and became very upset. Petitioner shredded some of the checks, but she then decided that was not the right thing to do and put them back in the drawer. They subsequently disappeared.

Eads testified that she could not recall seeing a stack of uncashed checks in Cain's desk drawer. She claimed that, when she was in Cain's guest room, petitioner brought a handful of checks to her and instructed her to get rid of them, which she did. According to Eads, she had already disposed of the checks when she consulted counsel on January 18, 2013. Eads knew that a check is a negotiable instrument and an I.O.U. is a promise.

At her deposition, Eads produced the checkbook carbonless copies of the checks she had written to Cain. Those checks totaled $49,477. They largely correlated to cashed checks written by Cain to Eads, who endorsed and cashed them. Petitioner claimed Eads owed money to the Trust.

Following her father's death, petitioner undertook administration of the Trust. She had advanced monies on behalf of the Trust. At the time of the hearing, the trust estate had a net value of approximately three million dollars.

Eads's understanding was that petitioner and she were co-trustees of the Trust. According to Eads, Cain had also explained that a percentage of the Trust would come to her. Eads acknowledged that she had received as little as $50,000 or as much as $160,000 from Cain over the years prior to his death.

Eads acknowledged that Cain and she never lived as a man and woman under the same roof at any time during their relationship. Eads did not know Anderson or Joy Dewhirst, and she had never met Ketenjian. According to Eads, Cain dated Davoren for a short time when she and Cain had briefly broken up in the 1990's; Davoren and Cain had remained friends, and Davoren had been hired to care for Cain after his 2009 surgery.

Eads acknowledged that she had never had authority to sign on any of Cain's accounts and that she was not involved in any of his investments or financial affairs. He had not given her a password to any financial account.

Eads recognized Cain's handwriting on the last page of schedule A, the inventory of the trust estate, and on the estate planning letter regarding distribution of personal

11

items not distributed through the Trust or his Will. Eads recognized that the two handwritten words "eliminate" on page 6 of the trust instrument, adjacent to the paragraphs providing for distributions to Larry and to her, as Cain's handwriting. She did not dispute that those provisions had been lined out.

A forensic document examiner, testifying as an expert, opined that the notations on page 6 of the trust instrument regarding distributions to Eads and Larry were written by Cain. He did not have an opinion as to who had stricken the text adjacent to Cain's notations of "eliminate."

Cain's thrift savings plan account, for which Eads and Davoren were the designated beneficiaries, was worth approximately $300,000 when it was paid. Eads acknowledged that, as a beneficiary of that account, she received a payment of approximately $159,000. Eads had elected a lump sum payment rather than a monthly payment.

Anthony Wagenersmith, whose father was David Smith, Cain's half-brother, was named as a successor trustee of the trust, after Eads and petitioner. Wagenersmith, who was an ordained pastor in the Seventh-Day Adventist Church at the time of the hearing, first met Eads in 1996 while visiting Cain. He heard Eads ask Cain to lend her more money. Cain later explained to Wagenersmith that he had loaned Eads a large amount of money and Eads was asking for more, and Cain indicated that he was having a hard time deciding what to do about that situation.

Cain had asked Wagenersmith about Larry's well being every time they spoke on the telephone. Wagenersmith disclosed to Cain that his Uncle Larry had a pattern of "blow[ing] the money" provided to help him. Wagenersmith asked about petitioner in their conversations, but he did not directly interact with petitioner before Cain passed away.

During the five years prior to Cain's death, Wagenersmith and Cain spoke about every four to six months; they called each other. In fall 2009, Cain told Wagenersmith

12

that he had had a falling out with Eads about money, and he said it was very sad. In subsequent conversations, Cain never mentioned Eads but he did mention petitioner, his grandchildren, and Davoren.

After petitioner and her family moved to California, Cain shared with Wagenersmith during their telephone conversations how much it meant to him and how great it was to spend time with his grandchildren. It sounded to Wagenersmith as though Cain and petitioner had become much closer as a result of the move.

Pulver had been Cain's neighbor in Los Gatos for about 25 years. He talked with Cain almost every night when Pulver returned home from work if Cain was in town. They were both engineers. Engineers do all their writing and marking in pencil.

Pulver had signed Cain's 2008 designation of Eads as the sole beneficiary of his thrift savings plan account. Cain never discussed any change in the beneficiary designation with Pulver.

After Pulver moved to a smaller place down the street in about February 2011, Cain bought the place next door and they continued as neighbors.

Cain discussed his personal life with Pulver. Cain had several romantic relationships going at the same time, and he liked to go out with different women. Cain indicated to Pulver that he really liked Davoren, but he did not want to lose his freedom. Cain visited Eads when he was in the Carmel area, and he spent occasional weekends with her in Pacific Grove. Pulver testified that Cain did not "want to report to anybody" but rather "he wanted to go out with, bluntly, a few different wom[e]n all of the time . . . ."

Pulver remembered that Cain was extremely excited when petitioner decided to move to the area.

Cain expressed concern to Pulver that his money would run out. Cain wanted his assets to generate cash for a long time for the benefit of petitioner. Cain did not mention Eads in this context. It was Pulver's impression that Cain wanted petitioner to manage

13

his assets; Cain commented on her tenacity and organizational skills.  Eads was not mentioned.

Cain never showed the Trust or his Will to Pulver.  They never discussed whether Eads was a trustee of the Trust.

For the 12 to 14 years prior to his death, Cain was a client of Randy Warshawsky, an enrolled agent authorized to practice before the Internal Revenue Service (IRS).  Warshawsky received a telephone call from Cain, who informed Warshawsky that he was leaving the hospital, he would not be able to make his appointment with Warshawsky because he would no longer be alive, petitioner would be taking care of tax issues going forward, and Warsawsky would need to work with petitioner on the preparations of income tax returns.

Eads was also a client of Warshawsky, who had represented her in "brushes" with the IRS.  At times, Cain had been brought into discussions with Warshawsky concerning Eads's tax issues.

Before sending a letter of offer and compromise on behalf of Eads to the IRS in 2008, Warshawsky consulted with Cain and determined that Cain was the source of the money to be paid to the IRS.  In consulting with Cain, Warshawsky became aware of certain loans made to Eads by Cain over the years.  Cain asked Warshawsky whether those loans could be written off as bad debt on his tax return because he was worried about repayment.  That topic arose in many subsequent years as well.

When Frank DiPaola moved to Monterey County, Eads was his real estate agent.  DiPaola met Cain in 1994, and they became friends.  DiPaola and his wife went out to dinner with Eads and Cain on weekends, and some years they invited Eads and Cain to their home on Thanksgiving and Christmas.  The two couples saw each other about four or five times a year.  Eads and Cain seemed like husband and wife to DiPaola.

In 2009, Eads told DiPaola that Cain was quite sick.  When DiPaola telephoned Cain, Cain indicated that Eads was spending time with him and he was grateful to her.

14

Cain did not mention that another long-time female friend was staying with him "24/7" following the surgery. DiPaola had no knowledge that Cain had "lady friends" other than Eads over the years. DiPaola probably saw Cain two times during 2012, Cain's last year of life.

Debbie Hoskins, Eads's daughter, first met Cain in 1987. She saw Cain about five to six times a year, at family holiday events and occasional dinners. Hoskins understood that, over the years, Cain typically visited her mother on the weekend and Eads occasionally spent the weekend at Cain's Los Gatos home. Hoskins conceded, however, that she had no personal knowledge of how long Cain spent with her mother when he visited, Cain's social life in Los Gatos, or his other friends.

Kenton Lee Busch, Eads's son, first met Cain at a family Fourth of July celebration in 1987. Cain attended all holiday and family events with his mother. When Cain was hospitalized in 2009, his mother went to the hospital and spent time with Cain before and after his recovery. In 2012, Busch saw Cain four or five times, and one of those occasions was his mother's birthday in September 2012.

On the occasion of Eads's birthday in September 2012, Cain indicated to Busch that he had taken care of Eads in the past, he would take care of Eads in the future, and there was an account for her, which would provide a monthly allowance. Cain insinuated that that was more than Busch had ever done, and would possibly ever do, for Eads. Busch saw Cain again at Christmas time.

## II

### *Discussion*

A. *Standard of Review*

"Evidence of the circumstances surrounding the execution of the trust instrument is properly admissible to ascertain its meaning and intent. [Citations.]" (*Burch v. George* (1994) 7 Cal.4th 246, 258, fn. 8 (*Burch*).) "Extrinsic evidence is 'admissible to interpret the instrument, but not to give it a meaning to which it is not reasonably susceptible'

15

[citations] . . . ." (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865.) Extrinsic evidence of a settlor's statements and conduct before and after the execution of a writing is also admissible for the purpose of ascertaining the intent with which the settlor executed the writing. (Cf. *In re Sargavak's Estate* (1950) 35 Cal.2d 93, 96-97; cf. also *Estate of Duke* (2015) 61 Cal.4th 871, 888.)

"The interpretation of a will or trust instrument presents a question of law unless interpretation turns on the credibility of extrinsic evidence or a conflict therein. [Citations.]" (*Burch*, *supra*, 7 Cal.4th at p. 254, fn. omitted.) It is the reviewing court's duty to independently construe the trust instrument where there is no conflict in the extrinsic evidence and no issues of credibility. (*Id.* at p. 254.) "The possibility that conflicting inferences can be drawn from uncontroverted evidence does not relieve the appellate court of its duty independently to interpret the instrument; it is only when the issue turns upon the credibility of extrinsic evidence, or requires resolution of a conflict in that evidence, that the trial court determination is binding. (*Parsons v. Bristol Development Co.*, 62 Cal.2d at p. 866, fn. 2.)" (*Estate of Dodge* (1971) 6 Cal.3d 311, 318, fn. omitted.) In contrast, "where extrinsic evidence has been properly admitted as an aid to the interpretation of [an instrument] and the evidence conflicts, a reasonable construction of the [instrument] by the trial court which is supported by substantial evidence will be upheld. [Citations.]" (*In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 746-747.)

In this case, the probate court relied on extrinsic evidence in ascertaining whether Cain intended to make operative changes with respect to the trust provisions that had provided for distributions to Eads and Larry. Since the record in the present case discloses no conflict in the extrinsic evidence and the parties have identified no credibility issue with respect to the construction of Cain's handwritten notations related to those provisions, we independently construe the trust instrument. (Cf. *Burch*, *supra*, 7 Cal.4th at p. 254.)

B. *Extrinsic Evidence*

The lower court found, based on the evidence, that Cain was "very, very meticulous." It found this significant and determined that Cain's intent was clear, especially in light of other evidence. Based on Cain's handwritten words "eliminate" accompanied by arrows pointing to the provisions for annual distributions to Eads and Larry and the striking out of those provisions, the court concluded that Cain had effectively revoked those provisions and the writing was a final expression of Cain's intent.

On appeal, Eads makes no suggestion that Cain's notations of "eliminate" did not constitute a written instrument.[5] Eads states that "[t]he second instrument consists of the handwritten word 'eliminate,' [*sic*] written twice in the margin next to the dispositive provisions of beneficiaries Eads and Smith." Rather, Eads argues that "[t]he trial court erred in disregarding the lack of any extrinsic evidence of the circumstances of creation of the instrument of revocation." She suggests that there is no extrinsic evidence of the circumstances surrounding those notations because there is no evidence of when they were added.

But neither the trust instrument nor the Probate Code required an amendment or a revocation of the Trust to be dated or witnessed. Section 21102, subdivision (a), provides: "The intention of the transferor as expressed in the instrument controls the legal effect of the dispositions made in the instrument." Subdivision (c) of section 21102 states: "Nothing in this section limits the use of extrinsic evidence, to the extent otherwise authorized by law, to determine the intention of the transferor."

---

[5] The Probate Code defines the term "instrument" as "a will, trust, deed, or other writing that designates a beneficiary or makes a donative transfer of property." (§ 45; see *Cory v. Toscano* (2009) 174 Cal.App.4th 1039, 1044-1046 [handwritten interlineations of a trust met the definition of an "instrument" under the Probate Code].)

17

Eads has cited no authority precluding consideration of admissible extrinsic evidence—both direct and circumstantial—that is relevant to determining a settlor's intent in executing a written instrument. The evidence showing that the words "eliminate" were handwritten by Cain and that the trust instrument was kept in his possession supports the reasonable inference that he was also responsible for the arrows pointing to, and the lining out of, the original trust instrument's provisions for distributions to Eads and Larry. The evidence that Cain was contemplating his own impending death at least since 2009 and that the trust instrument was carefully retained in his desk ready for petitioner's use upon his death supports the further inference that the changes with respect to the original distributions to Larry and Eads were meant to be operative.

The evidence of Cain's words and actions after he had been told that he had only three months to live circumstantially also supports the inference that Cain intended those changes to be operative. Cain told petitioner that she and her children were the beneficiaries and he wanted them to have everything. After Cain received petitioner's August 8, 2009 e-mail thanking him for leaving his "money" to her, he did not disabuse her of that understanding. Rather, he thanked her for the e-mail and then forwarded it to Eads. Cain retained petitioner's e-mail with his trust documents.

Cain's statements to petitioner and son-in-law during and after the family's summer 2009 visit and his thorough and exclusive mentoring of petitioner regarding the trust assets, financial matters, and taxes are consistent with an intention to leave the entire trust estate to petitioner and her progeny. Cain's statement to his nephew in the fall of 2009 that he had had a falling out with Eads over money is also consistent with an intent to eliminate Eads as a beneficiary.

Eads argues that "[o]ne would think 'the meticulous man' described by the court in its ruling from the bench . . . would at least have described or reported his action to 'eliminate' two substantial dispositive provisions to at least one witness . . . ." The

evidence reflects, however, that he did tell petitioner that she and her children were the beneficiaries of the Trust and he wanted them to have everything in the summer of 2009. He had also told petitioner that he was not leaving anything to Larry.

Eads suggests that, given Cain's meticulousness, Cain's failure to formally sign and notarize a new trust instrument with an attorney indicates that he did not intend his handwritten notations to be operative. We are not persuaded. Neither the original trust instrument nor statute required him to use such method to effectively amend or partially revoke the Trust. (See §§ 15401, 15402.)

Eads complains that the "pencil interlineations were not taken as a whole by the trial court" and the court erred in considering the words "eliminate" in isolation. She does not provide any record citation to support her contentions, and it is not apparent from the record that the court did not consider all of Cain's notations and marks on the trust instrument.

Moreover, the fact that Cain had placed question marks and other handwritten notations in the margins of trust instrument does not demonstrate, as Eads asserts, that *all* of them were merely preliminary steps toward a possible future amendment of the entire trust instrument. (Cf. *Estate of Uhl* (1969) 1 Cal.App.3d 138, 143 [The handwritten notation, "Revise whole mess," in the margin of the first page of a will was not "a conclusive indication that the other markings on the will merely represented possible future changes"].) Cain did not, for example, write "Eliminate?" next to the provisions at issue. Instead, Cain went to some length to make clear his intent to make operative changes by both adding the words "eliminate" and arrows pointing to those provisions and lining out those provisions.

We are satisfied, as was the lower court, that Cain intended his handwritten notations and markings related to the paragraphs providing for distributions to Eads and Larry to effect a change to his existing trust document, and they were not merely preliminary or tentative.

"The words of an instrument are to be given their ordinary and grammatical meaning unless the intention to use them in another sense is clear and their intended meaning can be ascertained." (§ 21122.) The word "eliminate" ordinarily means "to take out; remove; get rid of." (Webster's New College Dict. (2008) p. 461.) That is the correct construction of the word in this context, regardless of how that change is characterized.

C. *Method of Amendment or Revocation*

The remaining issue is whether Cain used an effective method to implement his intent to eliminate the paragraphs providing for annual distributions to Eads and Larry.

Section 15401 provides in pertinent part: "(a) A trust that is revocable by the settlor or any other person may be revoked in whole or in part by any of the following methods: [¶] (1) By compliance with any method of revocation provided in the trust instrument. [¶] (2) By a writing, other than a will, signed by the settlor or any other person holding the power of revocation and delivered to the trustee during the lifetime of the settlor or the person holding the power of revocation. If the trust instrument explicitly makes the method of revocation provided in the trust instrument the exclusive method of revocation, the trust may not be revoked pursuant to this paragraph."

Section 15402 provides in pertinent part: "Unless the trust instrument provides otherwise, if a trust is revocable by the settlor, the settlor may modify the trust by the procedure for revocation." "This section codifies the general rule that a power of revocation implies the power of modification. [Citations.] An unrestricted power to modify may also include the power to revoke a trust. [Citations.]" (Cal. Law Revision Com. com., 54 West's Ann. Prob. Code (1991 ed.) foll. § 15402, p. 575.)

In this case, the trust instrument did not explicitly make the methods of amendment or revocation provided in the trust instrument exclusive. Therefore, Cain, as the settlor, could accomplish a modification or revocation by complying with the method provided in the trust instrument or by complying with the statutory method. The trust

20

instrument's method for revoking the Trust, in part or whole, did *not* require Cain's signature. The other permissible methods for amending or revoking the trust did require his signature.

Eads's argument is that lower court erred in finding that Cain partially revoked the Trust. She maintains, as she did below, that Cain merely sought to amend the trust instrument and the purported amendment fails because Cain did not sign it. She argues that Cain did not revoke the Trust in part because no rights of testamentary disposition were restored to Cain and the Trust remained intact.[6]

Black's Law Dictionary defines the noun "amendment" to mean "[a] formal and usu. minor revision or addition proposed or made to a statute, constitution, pleading, order, or other instrument; specif., a change made by addition, deletion, or correction; esp., an alteration in wording." (Black's Law Dict. (10th ed. 2014) p. 98.) It defines the verb "amend" to mean the following: "**1.** To correct or make usu. small changes to (something written or spoken); to rectify or make right . . . . **2.** To change the wording of; specif., to formally alter . . . by striking out, inserting, or substituting words . . . ." (*Ibid.*) A standard dictionary meaning of the verb "amend" is to "alter in any way esp. in phraseology . . . ; *specif*: to alter . . . formally by modification, deletion, or addition." (Webster's 3d New Internat. Dict. (1993) p. 68.)

Black's Law Dictionary defines the term "revocation" as "[a]n annulment, cancellation, or reversal, usu. of an act or power." (Black's Law Dict., *supra*, p. 1515.) It defines the verb "revoke' to mean: "To annul or make void by taking back or recalling; to cancel, rescind, repeal, or reverse." (*Ibid.*) A standard dictionary meaning of the term "revocation" is "an act of revoking: the act by which one having the right annuls something previously done, a power or authority given, or a license, gift, or

---

[6] A complete revocation of a trust terminates it. (§ 15407, subd. (a)(5).) No one is suggesting that a complete revocation occurred here.

benefit conferred . . . ." (Webster's 3d New Internat. Dict., *supra*, p. 1944.) The verb "revoke" is commonly defined as "to annul by recalling or taking back . . . : RESCIND, CANCEL, REPEAL . . . ." (*Ibid*.)

Eads's understanding of word "revocation" in the context of the Trust is too narrow. "A trust is a fiduciary relationship with respect to property in which the person holding legal title to the property—the trustee—has an equitable obligation to manage the property *for the benefit of another*—the beneficiary. [Citations.]" (*Moeller v. Superior Court* (1997) 16 Cal.4th 1124, 1133-1134; see Rest.3d Trusts, § 2, p. 17.) "In the strict, traditional sense, a trust involves three elements: (1) a trustee, who holds the trust property and is subject to duties to deal with it for the benefit of one or more others; (2) one or more beneficiaries, to whom and for whose benefit the trustee owes the duties with respect to the trust property; and (3) trust property, which is held by the trustee for the beneficiaries." (Rest.3d Trusts, § 2, com. f., p. 21; see §§ 15200, 15201, 15202, 15205.)

Cain's elimination of the paragraphs providing for annual distributions to Eads and Larry eliminated them as beneficiaries of the Trust. While those changes could be described as amendments by deletion, they could equally be characterized as revocations of part of the Trust. Since the trust instrument permits partial revocations without a signature, we conclude that Cain effectively partially revoked the Trust. The probate court properly determined that Eads was not a beneficiary of the Trust.

## DISPOSITION

The February 7, 2014 order is affirmed. Petitioner is entitled to costs on appeal.

_____

ELIA, ACTING P.J.


WE CONCUR:




_____

BAMATTRE-MANOUKIAN, J.




_____

MIHARA, J.